| ATTORNEY DISCIPLINARY PROCEEDINGS
PER CURIAM.
This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respondent, Peter M. Meisner, an attorney licensed to practice law in Louisiana.
UNDERLYING FACTS AND PROCEDURAL HISTORY
The ODC filed two sets of formal charges against respondent, consisting of a total of five counts of misconduct. The charges were considered by separate hearing committees, then consolidated by order of the disciplinary board. The board then filed in this court a single recommendation *1098 of discipline encompassing both sets of formal charges.

03-DB-021

Count I — The Renovate Matter
Frank and Karen Castjohn retained respondent to represent their contracting company, Renovate, Inc. (“Renovate”), in disputes with several homeowners over insurance proceeds. In 1997, Mr. Castjohn negotiated with representatives of Republic Insurance Company (“Republic”) to settle the Mariam Jones matter for $7,579.20. At this time, respondent was employed by the New Orleans law firm of Milling Benson Woodward, L.L.P. (“Milling Benson”). In October 1997, respondent |2signed a letter agreement confirming the Mariam Jones settlement. On November 19, 1997, Republic issued a settlement check in the amount of $7,579.20 payable to “Renovate, Inc. and their attorney Peter Meisner.” Respondent denies that he received the settlement funds at this time. However, it is undisputed that in December 1997, respondent executed the settlement documents on behalf of Renovate. There is also no dispute that on December 15, 1998, one year after the issuance of the settlement check, the settlement proceeds were deposited into Milling Benson’s client trust account. On December 23, 1998, an amount identical to the settlement proceeds was transferred from the trust account to the firm’s operating account. In January and February 1999, Renovate received two invoices from Milling Benson for services rendered by respondent in connection with the Mariam Jones matter. These invoices, when added together, equaled the exact amount of the Republic settlement proceeds.
In June 2000, Mr. and Mrs. Castjohn filed a complaint against respondent with the ODC, alleging that he had “confiscated” the Mariam Jones settlement funds. The complainants also expressed concern about respondent’s billing practices and that he had not regularly communicated with them regarding their legal matters. Following the filing of the complaint, Milling Benson learned that the Mariam Jones settlement funds had been transferred in error from the firm’s trust account to its operating account. Thereafter, Milling Benson sent a check in the amount of $7,579.20 to Mr. and Mrs. Castjohn.
The ODC alleges that respondent’s conduct violates Rules 1.3 (failure to act with reasonable diligence and promptness in representing a client), 1.4 (failure to communicate with a client), and 1.15 (safekeeping property of clients or third persons) of the Rules of Professional Conduct. Respondent subsequently stipulated |ato a violation of Rules 1.3 and 1.4; however, he maintained that he did not violate Rule 1.15 because he did not know of, authorize, or approve the transfer of the Mariam Jones settlement funds from the Milling Benson trust account to its operating account.
Count II — The Oceanside Matter
Barry living and Chassity Hulbert Irving were represented in a personal injury claim by attorney Evan Tolchinsky.[1] During the representation, Mr. Tolchinsky referred the Irvings to a finance company, Oceanside, Inc. (“Oceanside”), to borrow money for living expenses. In July 1997, the Irvings each signed a promissory note and an “assignment letter.” The promissory note made no reference to the pending litigation. The “assignment letter” *1099 contained the following paragraph signed by the client:[2]

ASSIGNMENT

I hereby grant a lien against the proceeds of this case in favor of Oceanside Finance (or other company as noted above), and I authorize and direct Evan Tolchinsky, or any attorney who may subsequently represent me in this matter, to withhold and pay to the finance company the principal and interest of this loan and all previous or other loan(s). I understand that if the case is lost the loan becomes due and payable immediately.
| Respondent subsequently assumed the representation of the Irvings in the personal injury matter and filed suit on their behalf in Orleans Parish Civil District Court. In 1998, Oceanside forwarded three letters to respondent advising that the Irvings had made loans with the finance company which were guaranteed to be paid through the settlement of the personal injury case. The notice also requested that respondent provide a written guarantee of the loans, the payoff amounts of which were provided, but respondent refused to acknowledge the debt in writing. As a result, in November 1998 Oceanside filed a petition for intervention in the Irv-ings’ personal injury suit.[3] The Irvings were served with the intervention through respondent, but respondent did not file an answer or other responsive pleading on their behalf.[4]
In May 2000, respondent settled the Irv-ings’ personal injury suit. Although Oceanside’s petition for intervention was still pending at this time, respondent nevertheless distributed the proceeds of the settlement to the Irvings without protecting Oceanside’s interests because he did not consider the intervention to be valid. In June 2000, Jeffrey Reilley, counsel for Oceanside, filed a complaint against respondent with the ODC. Respondent thereafter withdrew from the representation of the Irvings. In September 2000, the trial court ordered respondent to deposit $5,000 into the registry of the court, which funds would be disbursed in accordance with a ruling on Oceanside’s intervention. Milling Benson subsequently deposited $5,000 into the registry of the court. In July 2001, the trial court rendered an order allocating $4,500 of this amount to Oceanside and $500 to Milling Benson.
| fiThe ODC alleges that respondent’s conduct violates Rule 1.15 of the Rules of Professional Conduct.
Count III — The Plaza Matter
Respondent represented Cathy Taylor and her son, Kenneth, in a personal injury matter. During the course of the representation, Ms. Taylor and Kenneth received medical treatment from Dr. Fritz *1100 Fidele at Plaza Medical Center (“Plaza”). Although Plaza’s charges totaled $4,275, the tortfeasor’s insurer determined that $1,975 represented the reasonable and customary fees for the services and treatment that had been provided to the Taylors. In November 1999, the insurer sent two checks to respondent totaling $1,975. These funds were deposited into Milling Benson’s trust account and subsequently transferred in error to the firm’s operating account.
In October 2000, respondent left his employment at the Milling Benson law firm. At no time prior to his departure from the firm did respondent disburse any funds to Plaza on behalf of the Taylors, prompting Dr. Fidele to file a complaint with the ODC. Following the filing of the complaint, Milling Benson made several requests to respondent for instructions about how to disburse the funds in its possession. Thereafter, respondent negotiated with Plaza to obtain a reduction in his clients’ medical expenses. In March 2001, Milling Benson paid the negotiated amount, $1,950, to Plaza.[5]
The ODC alleges that respondent’s conduct violates Rules 1.3 and 1.15 of the Rules of Professional Conduct. Respondent subsequently stipulated to a violation of Rule 1.3; however, he maintained that he did not violate Rule 1.15 because he did not | (¡know of, authorize, or approve the transfer of the settlement funds to the law firm’s operating account.

07-DB-006

Count I — The First General Matter
Donald Herrmann retained respondent to represent his construction company, First General Services of New Orleans (“First General”), in various collection matters. In September 1999, respondent filed a petition on open account in the matter entitled First General Services of New Orleans v. Allan Hogg, No. 99-15097 on the docket of the Civil District Court for the Parish of Orleans, alleging that the defendant, Mr. Hogg, owed $33,889.57 to First General. Although respondent requested service be made on Mr. Hogg, he failed to pay the service fees owed to the Orleans Parish Civil Sheriff. As a result, no effort was made to serve Mr. Hogg with citation and the original petition.
In 2003, Mr. Herrmann filed a complaint against respondent with the ODC. In the complaint, Mr. Herrmann expressed concern about the status of his lawsuit against Mr. Hogg and whether “the time has expired on our case.” Mr. Herrmann also stated that respondent did not maintain adequate communication with him, noting that respondent “has changed law firms at least 4 times since we originally gave him this case.... [He] has not informed us of his moving from company to company. We have trouble locating our files.”
After the complaint was submitted, respondent met with Mr. Herrmann to discuss First General’s pending matters, and Mr. Herrmann agreed to allow respondent to continue to handle those matters. In September 2003, respondent filed a supplemental petition in First General v. Hogg, re-asserting the demands set forth |7in the original petition and raising a new breach of contract claim against the defendant. Respondent requested service of citation and petition on Mr. Hogg, but the supplemental petition was never served on the defendant because the Civil Sheriff could not locate him.
The ODC alleges that respondent’s conduct violates Rules 1.3 and 1.4 of the Rules of Professional Conduct.
*1101 Count II — The McCallon Matter
In February 2002, Tyrone McCallon filed suit in federal court against a Louisiana State Trooper whom he contended had unlawfully arrested him. Tyrone McCallon v. Daryl Thomas, No. 02-0573 on the docket of the United States District Court for the Eastern District of Louisiana. The matter was assigned to United States District Judge Carl Barbier.
Mr. McCallon was initially represented in the matter by attorney Brett Prender-gast. In July 2002, Mr. McCallon met with respondent and retained him to handle the ongoing suit. On July 23, 2002, respondent prepared a letter for Mr. McCallon’s signature discharging Mr. Prendergast and requesting his file. Mr. McCallon signed the letter and mailed it to Mr. Prendergast by certified mail. On July 30, 2002, Mr. McCallon delivered some file materials to respondent. He also signed a retainer agreement on the letterhead of Sullivan, Stolier & Resor, A.P.L.C. (“SSR”), the law firm where respondent was then employed. However, respondent’s signature does not appear on the July 30, 2002 retainer agreement, and respondent now denies any knowledge of how the retainer agreement came to be signed by Mr. McCallon.
|sBy order dated July 30, 2002, the federal district court placed Mr. McCallon’s suit on the call docket because there had been no service on or answer by the defendant in the case. According to the call docket notice, plaintiffs counsel was required to appear in court on September 11, 2002 to report on the status of the case, and further provided that upon failure to appear, or in the absence of good cause shown why the case should remain on the docket, the suit would be dismissed. The federal court forwarded the notice to Mr. Prendergast as attorney of record for Mr. McCallon.[6] Mr. Prendergast forwarded the call docket notice to Mr. McCallon, who, in turn, immediately notified respondent of the hearing. According to Mr. McCallon, respondent assured him that he would make an appearance on that date and that he (Mr. McCallon) did not need to be present.[7] However, respondent failed to appear at the call docket setting and Mr. McCallon’s suit was dismissed. Because respondent had not filed a motion to enroll as Mr. McCallon’s counsel of record, the district court forwarded notice of the dismissal of the lawsuit to Mr. McCallon. Upon receipt of the judgment dismissing his case, Mr. McCallon contacted respondent. Mr. McCallon claims that respondent told him not to worry and that he would file a motion to reinstate the case.
In October, respondent requested that Mr. McCallon come to his office to execute some “paperwork.” Mr. McCallon met with respondent on October 29, 2002 and signed a retainer agreement on SSR letterhead. The October agreement was a duplicate of the July 30, 2002 retainer agreement signed by Mr. McCallon, except that it is also signed by respondent.
|9On November 15, 2002, respondent filed with the district court a Motion to Vacate Judgment Pursuant to Rule 60 of the Federal Rules of Civil Procedure. Respondent specifically alleged in the motion that he had been retained by Mr. McCal- *1102 Ion on October 29, 2002, and that at the time he accepted the case, he had no knowledge that it had been previously dismissed. Respondent further alleged that he knew the case was pending before the federal court “but not that it had been placed on the ‘call docket’ (which occurred the day before he was retained in this matter).”
Judge Barbier denied the motion to vacate on December 11, 2002. In written reasons for his ruling, Judge Barbier noted that Mr. McCallon waited approximately three months to hire respondent after Mr. Prendergast withdrew as counsel of record, and that during this interim when Mr. McCallon represented himself pro se, he “had a duty to monitor his case and make sure that his claims were timely prosecuted.”
On December 13, 2002, after receiving notice of the district court’s judgment on the motion to vacate, Mr. McCallon contacted SSR regarding the dismissal of his lawsuit. Upon reviewing Mr. McCallon’s file, attorney Stephen Resor discovered the July 30, 2002 retainer agreement executed by Mr. McCallon. Mr. Resor immediately notified Judge Barbier of his discovery and terminated respondent’s employment with the law firm.
On December 26, 2002, Mr. McCallon, now represented by attorney Cynthia Branch, filed an ex parte motion for reconsideration, alleging that respondent had made misrepresentations to the federal court in the motion to vacate. In support, Ms. Branch attached the letter from Mr. Resor to Judge Barbier regarding the discovery of the July 30, 2002 retainer agreement. Judge Barbier denied the motion for reconsideration, but issued an order to respondent to show cause why he should not be sanctioned under Rule 11 of the Federal Rules of Civil Procedure “for attempting |into mislead the Court through factual misrepresentations contained in the Motion to Vacate Judgment.”
The show cause hearing was held on February 13, 2003. Respondent and Mr. McCallon appeared and sworn testimony was taken from both parties. In his testimony, respondent admitted that he knew about the call docket setting sometime in August 2002, but he blamed another attorney in his office for drafting the motion to vacate which contained the inaccurate representation regarding the call docket. At the conclusion of the hearing, Judge Barbier found credible Mr. McCallon’s testimony that respondent agreed to represent him in the civil rights case in July 2002. Accordingly, Judge Barbier determined that the attorney-client relationship between respondent and Mr. McCallon was formed in July 2002. Judge Barbier further determined that in his pleadings filed with the district court, respondent intentionally misrepresented that he was unaware of the call docket setting and that he had not been retained to represent Mr. McCallon until October 2002. Judge Bar-bier concluded that respondent’s knowingly false representations violated Fed. R.Civ.P. 11 and warranted sanctions in the amount of $2,500, which Judge Barbier ordered be paid within ten days.[8]
The.ODC alleges that respondent’s conduct violates Rules 1.3, 1.4, 3.3 (candor toward the tribunal), 4.1 (truthfulness in statements to others), 8.4(a) (violation of the Rules of Professional Conduct), 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation), and 8.4(d) (engaging in conduct prejudicial to *1103 the administration of justice) of the Rules of Professional Conduct. Respondent subsequently stipulated to a violation of Rule 3.3 in connection with his admittedly | nfalse representation to the federal court that he was unaware of the call docket setting; however, respondent maintained that he did not violate any of the other rules charged.
DISCIPLINARY PROCEEDINGS
Respondent was served with both sets of formal charges and filed answers thereto. After some delay attributable to discovery disputes between the parties and the ODC’s investigation of the complaints which ultimately formed the basis for the second set of formal charges, the matters finally proceeded to formal hearings before separate hearing committees.

Hearing Committee Reports

03-DB-021

After considering the evidence and testimony presented at the hearing, the hearing committee made the following factual findings:
Count I: The committee noted that there is some dispute as to when respondent received the Republic settlement check. Nevertheless, it is clear that he received and ultimately executed settlement documents sometime in late 1997; it was not until December 1998 that the settlement check was deposited into the Milling Benson trust account. Respondent failed to communicate with the Castjohns regarding the settlement throughout this time frame. To the extent a settlement check was not included with the release documents that respondent executed in 1997, he was neglectful and less than diligent in failing to obtain the funds within a reasonable time following execution of the release and dismissal. In other words, if respondent, in fact, did not receive the proceeds until late 1998, taking no action in the interim was neglectful. On the other hand, if respondent did receive the funds in 1997, holding them until December 1998 was neglectful and less than diligent.
| iaThere is also contradictory testimony on the issue of who directed the transfer of funds from the Milling Benson trust account to the operating account and the subsequent billing of Renovate. The ODC points to the testimony of Barbara DiMaggio, Milling Benson’s long time accounts receivable manager. Ms. DiMaggio explained that the process for billing a file required that the attorney in charge of the file review .a draft bill and approve it. Similarly, attorneys receiving checks made payable to Milling Benson or those responsible for the relevant matter would direct where the checks would be deposited. However, Ms. DiMaggio testified that she did not generate respondent’s bills, and more particularly the bills at issue here.
Regarding the payment from the trust account to the operating account, respondent testified that he had no recollection of seeing the check from Republic and that checks were routinely routed by the mail-room or staff to the accounting department. He also attested that he did not authorize Ms. DiMaggio to make a transfer from the trust to operating account.
Timothy Roniger, a former Milling Benson partner and vice-chair of its litigation section, and Victoria Gamble, a former office administrator and director of technology for Milling Benson, offered illuminating testimony regarding the firm’s billing procedures and trust accounting. The committee was impressed with the credibility of both Mr. Roniger and Ms. Gamble. For example, Mr. Roniger acknowledged that respondent was likely not involved in generating the bills at issue to Renovate, and someone other than respondent signed *1104 the trust check, likely as a convenience to Ms. DiMaggio. Ms. Gamble’s testimony revealed significant shortcomings in the billing statements to Renovate, and that respondent likely was not involved in creating or sending those statements. The testimony of Mr. Roniger and Ms. Gamble casts significant doubt on the contention that respondent was directly involved in, or had knowledge of, the deposit of settlement funds into the trust | lsaccount, transfer of funds to the operating account, and the generation and forwarding of billing statements to Renovate. Also, these witnesses’ testimony makes it less than clear that any Milling Benson lawyer would necessarily be involved in the receipt of funds at Milling Benson, and the decision of the account(s) into which the funds would be deposited.
Similarly, Ms. Gamble’s testimony addressing Milling Benson’s actual practices regarding billing procedures, banking deposits, and transfers casts significant doubt on the assertion that respondent was involved in or even knowledgeable of the transfer of the settlement funds from the trust to operating account. For example, Ms. DiMaggio had another Milling Benson partner sign the trust check transferring funds into the operating account, rather than respondent. In addition, respondent’s Exhibit 1 reveals that Ms. DiMaggio issued a written directive to another Milling Benson accounting employee, Dawn Cancienne, to make the transfer from the trust account to the operating account.
Based on these findings, the committee concluded there is not clear and convincing evidence that (a) respondent directed Ms. DiMaggio to transfer the settlement funds from the trust account to the operating account on December 23, 1998, or (b) respondent saw or reviewed the subsequent billing statements that were sent to Renovate. Accordingly, as to Count I, the committee found that respondent did not violate Rule 1.15, as charged. However, because respondent stipulated to violations of Rules 1.3 and 1.4, the committee found those rules were violated.
Count II: Respondent took the position that he was not obligated to deliver any portion of the Irvings’ settlement funds to Oceanside because Oceanside had no interest in the funds. Respondent relied on the precedent set forth in Lewis v. Kubena, 00-2362 (La.App. 4th Cir.10/24/01), 800 So.2d 68, which involved a very similar claim by Oceanside. In Lewis, the Fourth Circuit held that Oceanside had no 114interest in the proceeds of a personal injury suit because it had no lien right. The complainant in the instant matter was well aware of Lewis, as he was counsel of record for Oceanside in that case, and apparently as a result of it, he chose not to seek a judicial declaration regarding the validity of Oceanside’s alleged lien on the Irvings’ settlement proceeds.
The committee found that respondent, who had no relationship with Oceanside, or involvement in the underlying transaction, acted properly in distributing the settlement proceeds as he did. To do otherwise would have exposed him to a claim from the Irvings that he violated Rule 1.15 by distributing their funds to a party not entitled to them. The committee therefore concluded that there is no clear and convincing evidence of respondent’s violation of Rule 1.15.
Count III: Mr. Roniger testified that it was an error, apparently Ms. DiMaggio’s, to deposit the settlement funds for Cathy and Kenneth Taylor into the Milling Benson operating account. Ultimately, the funds were transferred back to Milling Benson’s trust account, where they should have been deposited originally. The committee found it was clear that the delay in *1105 responding to Dr. Fidele was neglectful and less than diligent, and therefore respondent violated Rule 1.3. However, the committee found the ODC did not prove by clear and convincing evidence that respondent violated Rule 1.15.
In sum, considering the stipulation of respondent that he violated Rules 1.3 and 1.4 in Count I and Rule 1.3 in Count III, the committee determined that the ODC proved those specific violations by clear and convincing evidence. The committee did not find clear and convincing evidence that respondent violated Rule 1.15 as charged in Counts I, II, or III.
The committee determined that respondent violated duties owed to his clients in Count I and to a third party in Count III. He acted negligently in failing to timely 115communicate with clients and a third party regarding the status of two settlements, and in promptly transmitting the settlement proceeds to them as he was obliged to do. The Castjohns were deprived of their funds for almost two years. While the amount of money owed to their company was modest, the frustration and anxiety experienced by the Castjohns was evident in their testimony, which the committee found to be credible. Similarly, Plaza was deprived of funds due it for many months. However, the committee found Plaza sustained little, if any, actual harm by respondent’s conduct, given that Plaza is a “sophisticated provider of medical services, often to litigants,” and in light of “the uncontradicted evidence that it negotiated an amount substantially less than its initial claim, based on Allstate’s initial assessment that its charges were neither customary nor reasonable.” Relying on the ABA’s Standards for Imposing Lawyer Sanctions, the. committee determined that the applicable baseline sanction is a suspension.
As aggravating factors, the committee found prior disciplinary offenses,[9] a pattern of misconduct, multiple offenses, and substantial experience in the practice of law (admitted 1980). The committee found the following mitigating factors are present: absence of a dishonest or selfish motive, personal or emotional problems,[10] timely good faith effort to rectify the consequences of the misconduct, full and free disclosure to the disciplinary board and a cooperative attitude toward the proceedings, and remorse.
After considering this court’s prior jurisprudence involving similar misconduct, the committee concluded:
| ic.On balance, the aggravating factors here outweigh the mitigating factors. The Committee finds the existence of mitigating factors as presented by Mr. Meisner. Notably, ODC did not attempt to contest them. However, the history of two instances of prior discipline, Mr. Meisner’s lengthy experience practicing law, and the pattern of misconduct presented, are significant factors that the Committee cannot overlook. Accordingly, the Committee finds that the purposes of the Rules of Professional Conduct, and the Disciplinary process itself would be best served if *1106 Mr. Meisner receives a sanction that requires some modest period of time be imposed during which he is actually suspended from practicing law, and the Committee feels that ninety (90) days is an appropriate amount of time.
Based on this reasoning, the committee recommended that respondent be suspended from the practice of law for one year and one day, with all but ninety days deferred, followed by an eighteen-month period of supervised probation during which he must attend the Louisiana State Bar Association’s Ethics School.
Both respondent and the ODC filed objections to the hearing committee’s report and recommended sanction.

07-DB-006

After considering the evidence and testimony presented at the hearing, the hearing committee made the following factual findings:
Count I: The committee found that Mr. Herrmann retained respondent in 1996 or 1997 to handle what were essentially collection matters against customers who failed to pay for services rendered by his company, First General. In 1999, Mr. Herrmann retained respondent to pursue collection efforts against Allan Hogg, a former customer who failed to pay $33,889.57 for a restoration job completed by First General. In September 1999, respondent filed a petition on open account against Mr. Hogg on behalf of First General. Although respondent requested service on Mr. Hogg, he failed to pay the service fees owed to the Orleans Parish Civil Sheriff. As 117a result, no effort was made to serve the defendant with citation and the original petition. The committee noted that respondent did not take any immediate action to secure or confirm that service upon the defendant had been made, and at some time thereafter, the defendant left the jurisdiction, or at least his last known address. The committee observed that “had respondent kept track of service from the time of filing, defendant more likely than not, could have been served at his last known address. Any other steps Respondent may have taken to keep the matter alive, or suggest in finding defendant and serving him, may never have been needed had he been diligent in the matter from its inception.” The committee observed that this lack of diligence by respondent is “chronic.”
The committee noted that respondent worked for four different law firms during the time that he represented First General. Eventually, Mr. Herrmann requested his files and filed a complaint with the ODC. Thereafter, Mr. Herrmann and respondent met to discuss pending matters. Respondent offered to continue to represent Mr. Herrmann, and he agreed. Ultimately, Mr. Herrmann was not pleased with the representation and stated at the formal charge hearing that respondent was no longer his attorney. The committee found that while respondent may have communicated with Mr. Herrmann about his changes in address, he did fail “to execute or bring to a reasonable prompt conclusion to the Allan Hogg matter” and failed “to properly communicate with his client regarding the status of representation,” in violation of Rules 1.3 and 1.4 of the Rules of Professional Conduct.
Count II: The committee found that on July 23, 2002, respondent met with Mr. McCallon to discuss his pending lawsuit against a Louisiana State Trooper. At this time, Mr. McCallon was represented by attorney Brett Prendergast. During the meeting, Mr. McCallon asked respondent to take over the representation of his case, hsbut respondent said that he could not do so until Mr. McCallon discharged Mr. Prendergast. Respondent offered to assist Mr. McCallon in discharging his at *1107 torney. Respondent instructed his secretary to prepare a letter of discharge addressed to Mr. Prendergast for Mr. McCallon’s signature. The discharge letter was prepared, signed, and mailed to Mr. Prendergast by certified mail. Mr. Prendergast received the discharge letter on July 25, 2002. On July 30, 2002, he filed a motion and order to withdraw as counsel of record in Mr. McCallon’s suit.
The committee found that although the evidence conflicts as to when Mr. McCal-lon actually signed a retainer agreement with respondent, it was clear that once he discharged his prior attorney, Mr. McCal-lon believed respondent was his attorney. The committee further found that considering the surrounding circumstances, Mr. McCallon’s belief was reasonable.
On July 30, 2002, the federal court placed Mr. McCallon’s case on the call docket for September 11, 2002. The call docket notice was sent to Mr. McCallon. Respondent admits that Mr. McCallon notified him of the call docket setting prior to September 11, 2002; however, he states that he instructed Mr. McCallon to attend because he (respondent) had a conflict. The committee found it was not reasonable for respondent to depend on his client to appear for the call docket, and that he should have attended himself, requested a continuance, or sent someone else from his office. In any event, neither respondent nor Mr. McCallon appeared for the hearing, and as a result, Mr. McCallon’s lawsuit was dismissed.
Apparently in an attempt to revive the lawsuit, respondent had Mr. McCallon sign and date a second engagement letter in October 2002. Respondent referred to the October engagement letter in a Motion to Vacate the Dismissal alleging he was not representing Mr. McCallon at the time of the call docket and did not know of the hearing. Despite these misrepresentations, the court denied Mr. McCallon’s motion | mto vacate prepared and filed by respondent. A member of respondent’s law firm subsequently reported the matter to Judge Barbier. As a result, Judge Barbier ordered respondent to appear before him on February 13, 2003 to answer a rule to show cause why he should not be sanctioned. Judge Barbier found that respondent misrepresented the date of the retainer agreement so as not to be found at fault for missing the call docket. For his misrepresentations to the court, Judge Barbier sanctioned respondent $2,500 to be paid within ten days. Respondent did not appeal the court’s ruling and has paid the sanction.
The committee observed that “there are many conflicting assertions and evidence” regarding Count II, but ultimately found that respondent’s admission that he violated Rule 3.3 of the Rules of Professional Conduct by making false statements of material fact to the federal court “provides the admission of many elements necessary to provide other violations alleged in Count II.” Based on this reasoning, the committee found sufficient evidence that respondent violated Rules 1.3, 3.3, 4.1, 8.4(c), and 8.4(d) in Count II.
The committee determined that respondent violated duties owed to his clients, the public, the legal system, and the profession. Although respondent clearly knew what he was doing was inappropriate, the committee found the damage appeared to have been initiated by his negligence in properly calendaring, following up, or otherwise monitoring his files. His subsequent actions, once mistakes were apparent, seem to involve trying to correct the problems his negligence and lack of diligence created. Therefore, while the committee did not find that respondent intended harm to his clients, the public, the legal *1108 system, or the profession, nonetheless, clearly that was the result.
12pln aggravation, the committee found that respondent has a prior disciplinary record. In mitigation, the committee considered the following factors: personal or emotional problems and the imposition of other penalties or sanctions.
Under these circumstances, the committee recommended that respondent be suspended from the practice of law for one year, followed by six months of supervised probation.
Both respondent and the ODC filed objections to the hearing committee’s report and recommended sanction.

Disciplinary Board Recommendation

03-DB-021 & 07-DB-006

After review, the disciplinary board determined that the hearing committees’ factual findings are not manifestly erroneous. The board made the following determinations concerning the alleged violations of the Rules of Professional Conduct:

03-DB-021

Rule 1.3 requires that a lawyer shall act with reasonable diligence and promptness in representing a client. Respondent has admitted that his conduct in Counts I and III failed to meet the reasonable diligence standard of Rule 1.3. In Count I, he failed to diligently pursue the location of the settlement funds for the Castjohns. As a result, the Castjohns were deprived of the funds for several months. In Count III, respondent admitted that if he had simply written a letter to Dr. Fidele, requesting that the doctor accept a lower amount to settle his claim, the matter could have been resolved in a much shorter time period. However, respondent failed to do so. Therefore, respondent violated this rule in Counts I and III.
121 Rule 1.1 requires, among other things, that a lawyer keep a client reasonably informed about the status of a matter and promptly reply to reasonable requests for information. Respondent has admitted he violated this rule in Count I by failing to keep the Castjohns informed about the status of the settlement funds and by failing to promptly inform the Castjohns about the location of those funds.
Rule 1.15(a) states that a lawyer shall hold property of clients or third persons that is in a lawyer’s possession in connection with a representation separate from the lawyer’s own property. In Counts I and III, the hearing committee determined that respondent was not responsible for the transfer of client/third-party funds from the Milling Benson trust account to the operating account. The committee based this finding on witness testimony which it found to be credible and which it felt established that (1) a lawyer at Milling Benson would not necessarily be involved in the receipt of funds or the decision of what accounts into which the funds would be deposited; and (2) it was doubtful that respondent was aware of or knew about the transfer of funds from the trust account to the operating account. Finding nothing in the record to indicate that this determination by the committee was manifestly erroneous, the board concluded that respondent did not violate Rule 1.15(a) in Counts I or III.
Rule 1.15(b) requires that upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. In Count II, respondent disbursed settlement funds contrary to an alleged interest of Oceanside. The hearing committee found respondent’s argument credible that Oceanside did not have any interest in the funds based on prior case law. The board determined this find *1109 ing was not manifestly erroneous, and therefore concluded that respondent did not violate Rule 1.15(b) in Count II.
12¿Rule 1.15(c) requires that when a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the laivyer until the dispute is resolved. The board found there was a violation of this rule in Count II because a third party, Oceanside, claimed an interest in the Irvings’ settlement funds, but respondent failed to segregate the funds until the dispute was resolved. Regardless of whether Oceanside had an interest in the funds or not, respondent failed to properly handle the situation as Rule 1.15(c) requires. Oceanside filed an intervention and sent letters to respondent, asserting its right in the settlement funds, but respondent failed to acknowledge Oceanside’s claim. Instead of segregating the funds pending resolution of Oceanside’s alleged interest, as Rule 1.15(c) requires, respondent simply made his own determination and distributed the funds to his clients. Respondent should have deposited the funds in his trust account or the court registry, pending the determination of Oceanside’s interest.[11] Based on this reasoning, the board found respondent violated Rule 1.15(c) in Count II.
However, with regard to Count III, the board agreed there was no violation of Rule 1.15(c), based upon the committee’s finding that respondent was not responsible for and did not know about the transfer of Dr. Fidele’s funds to Milling Benson’s operating account.

07-DB-006

Rule 1.8 requires that a lawyer act with reasonable diligence and promptness in representing a client. In Count I, respondent filed suit against Allan Hogg on | 2p,behalf of First General in 1999. Respondent failed to ensure that the suit was served and was not diligent in his efforts to locate the defendant, in violation of Rule 1.3.
In Count II, respondent entered into an attorney-client relationship with Mr. McCallon sometime in late July 2002. Respondent has admitted that he was aware of the call docket hearing scheduled for September 11, 2002 and that he discussed it with Mr. McCallon. However, respondent maintains that he informed Mr. McCallon that he could not make it to the hearing and that Mr. McCallon should attend. Mr. McCallon disputes this. While Mr. McCallon’s credibility may have been called into question by the hearing committee, the board noted that respondent could have taken steps to ensure that someone attended the call docket or could have taken steps to request another call docket setting from the court. Respondent did neither. Therefore, the board agreed that respondent violated Rule 1.3 in Count II.
Rule l.lp requires a lawyer to keep a client reasonably informed about the status of a matter and to promptly comply with reasonable requests for information. In Count I, respondent claims to have adequately communicated with his client, Mr. Herrmann and First General, regarding the Allan Hogg matter. In support of this claim, he submitted four letters written to Mr. Herrmann regarding the Hogg matter dated January 24, 2003, February 20, 2003, October 20, 2003, and October 27, *1110 2003. However, the Hogg lawsuit was filed in 1999. Also, Mr. Herrmann testified that it was very difficult to get in touch with respondent. Respondent testified that he notified Mr. Herrmann when he left Milling Benson, but he could not provide evidence of such. Contradicting respondent’s testimony is a letter that Mr. Herrmann’s employee, William Rex, sent to Milling Benson on February 1, 2002, in which he disputes charges for telephone messages left for respondent and states that he has had a very difficult time getting in touch with respondent. Respondent produced no evidence of his communication with Mr. Herrmann or anyone at First ^General from 1999 through 2002. Accordingly, the board found respondent violated Rule 1.4 in Count I.
In Count II, respondent did not adequately communicate with Mr. McCallon to ensure that someone attended the call docket hearing. Mr. McCallon’s testimony indicates that he asked respondent to represent him on July 30, 2002. In his reasons for sanctioning respondent, the federal judge found an attorney-client relationship was formed between respondent and Mr. McCallon in late July 2002. Even if respondent thought no attorney-client relationship had formed at that time, Mr. McCallon thought one had. Finding this indicates a lack of communication by respondent, the board concluded that he violated Rule 1.4 in Count II.
Rule 3.3 states, among other things, that a lawyer shall not knowingly make a false statement of material fact to a tribunal. Respondent has admitted to violating this rule in Count II. In his motion to vacate the judgment of dismissal of Mr. McCal-lon’s federal complaint, respondent stated that he did not have knowledge that the matter was placed on the call docket. However, respondent has admitted that he was aware of the call docket hearing before it occurred. Therefore, respondent violated Rule 3.3 in Count II.
Rule Jp.l states that, in the course of representing a client, a lawyer shall not knowingly make a false statement of material fact or law to a third person. The board found respondent did not violate this rule in Count II. Rule 4.1 does not cover statements to a tribunal; rather, “third person” refers to adverse counsel, adverse parties, clients, and other persons. There is no evidence in the record that constitutes a false statement by respondent to Mr. McCallon; therefore, the hearing committee erred in finding a violation of this rule.
Rule 84(a) states, among other things, that it is professional misconduct for a lawyer to violate or attempt to violate the Rules of Professional Conduct. By his |2fiConduct in violation of the other Rules of Professional Conduct, respondent has violated Rule 8.4(a).
Rule 84(c) states that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. In late October 2002, respondent called Mr. McCallon to his office and had him execute a second retainer agreement. Respondent subsequently used this retainer agreement to attest to the federal court that he was not retained by Mr. McCallon until October 29, 2002. However, as noted above, the attorney-client relationship existed as of late July 2002. Finding the record supports the hearing committee’s finding that respondent knew his actions were inappropriate, the board found respondent violated Rule 8.4(c) in Count II.
Rule 84(d) states that it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice. By making misrepresentations to the federal court in an attempt to reinstate his client’s case and to cover up *1111 his own misconduct, respondent violated Rule 8.4(d) in Count II.
The board determined that respondent violated duties owed to his clients, the public, and the legal system. In Counts I and III of 03-DB-021, respondent’s misconduct was the result of negligence. However, in Count II of 03-DB-021 and in both counts of 07-DB-006, respondent’s conduct was knowing, and in some instances, intentional. Considering the ABA’s Standards for Imposing Lawyer Sanctions, the board found the applicable baseline sanction in this matter is suspension.
The board found the following aggravating factors are present: prior disciplinary offenses, a pattern of misconduct, multiple offenses, and substantial experience in the practice of law. The board found the record supports the following mitigating circumstances: absence of a dishonest or selfish motive (in 03-DB-021), | ^personal or emotional problems, timely good faith effort to rectify the consequences of the misconduct (in 03-DB-021), a cooperative attitude toward the disciplinary proceedings, remorse (in 03-DB-021), and imposition of other penalties or sanctions (in Count II of 07-DB-006).
The board then turned to an analysis of prior case law involving misconduct similar to respondent’s. In In re: Stephens, 94-1924 (La.11/18/94), 645 So.2d 1133, the attorney was suspended for eighteen months for failing to communicate with his client and notarizing a forged affidavit which he then filed into the court record. In In re: Bailey, 03-0839 (La.6/6/03), 848 So.2d 530, the attorney was suspended for two years for altering a medical record that was introduced into evidence and for lying about a scheduling conflict. In In re: Trichel, 00-1304 (La.8/31/00), 767 So.2d 694, an attorney who had a prior disciplinary record for similar misconduct was suspended for eighteen months for failure to communicate with a client, neglect of the client’s legal matter, and failure to properly terminate the client’s representation.
Considering all these facts and circumstances, and taking into account respondent’s misconduct as a whole, the board concluded that a lengthy suspension is appropriate. Accordingly, the board recommended that respondent be suspended from the practice of law for three years.
Both respondent and the ODC filed objections to the disciplinary board’s recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).
DISCUSSION
Bar disciplinary matters fall within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has_[gjbeen proven by clear and convincing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343; Louisiana State Bar Ass’n v. Boutall, 597 So.2d 444 (La.1992). While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee’s factual findings. See In re: Caulfield, 96-1401 (La.11/25/96), 683 So.2d 714; In re: Pardue, 93-2865 (La.3/11/94), 633 So.2d 150.
We agree that the factual findings of the hearing committees are generally supported by the voluminous record of this matter. These factual findings support a determination that respondent violated the Rules of Professional Conduct as found by the disciplinary board.
Having found evidence of professional misconduct, we now turn to a deter *1112 mination of the appropriate sanction for respondent’s actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana State Bar Ass’n v. Reis, 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass’n v. Whittington, 459 So.2d 520 (La.1984).
The record supports the board’s findings with respect to the duties violated by respondent, as well as his mental state. We further agree that the applicable baseline sanction is suspension. We adopt the aggravating and mitigating factors found by the board.
A three-year suspension, as recommended by the board, is an appropriate sanction for the proven misconduct in both sets of formal charges. However, in light of the mitigating factors present, and because the aggravating factors are relatively |2sfew in number, we will defer two years of the suspension and place respondent on supervised probation for that period. We caution respondent that any future misconduct may be grounds for making the deferred portion of the suspension executory or imposing additional discipline, as appropriate.
DECREE
Upon review of the findings and recommendations of the hearing committees and the disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Peter M. Meisner, Louisiana Bar Roll number 9410, be and he hereby is suspended from the practice of law for three years.- It is further ordered that two years of the suspension shall be deferred. Following completion of the active portion of his suspension, respondent shall be placed on supervised probation for two years, subject to the condition that any misconduct during this period may be grounds for making the deferred portion of the suspension executory, or imposing additional discipline, as appropriate. The probationary period shall commence from the date respondent, the ODC, and the probation monitor execute a formal probation plan. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.
VICTORY, J., dissents and would impose a longer period of suspension.
TRAYLOR, J., concurs in the finding but dissents from penalty.

. In 1999, this court accepted a petition for consent discipline and disbarred Mr. Tolchin-sky for failing to properly supervise his employee, disbarred attorney Jose Castro, who engaged in the unauthorized practice of law and improperly solicited clients by using runners. See In re: Tolchinsky, 99-1742 (La.9/3/99), 740 So.2d 109.

.It appears that Oceanside had an arrangement with Mr. Tolchinsky's law firm, The Personal Injury Law Center, whereby either he or Mr. Castro called Oceanside to request that the finance company loan money to one of the firm's clients, based upon the attorney’s personal guarantee. If Oceanside agreed to make the loan, the attorney filled in the blanks of a form letter on Law Center stationery and signed it. The attorney then sent the client, with the letter, to Oceanside’s office, where the client would sign the bottom of the form letter to authorize Oceanside's recovery of the loan from any proceeds of the referenced litigation.

. At the time the intervention was filed, Mr. Irving owed $1,214.62 to Oceanside and Mrs. Irving owed $1,023.70.

. In January 1999, Oceanside filed a motion for preliminary default against the Irvings; however, it does not appear that an order granting a preliminary default was ever signed by the trial court.

. Milling Benson paid the remaining $25 in its possession to respondent's new law firm.

. On July 30, 2002, Mr. Prendergast filed a motion to withdraw as counsel of record for Mr. McCallon, on the ground that his services had been terminated. The court granted the motion the following day, July 31st, and the order was entered into the court record on August 2nd.

. Respondent disputes Mr. McCallon’s claim. He maintains that he told Mr. McCallon that he had a schedule conflict and that he would "try to be there," but that Mr. McCallon would "have to be there.”

. Judge Barbier testified before the hearing committee that the sanctions have been paid by respondent.

. In 1997, respondent was admonished by the disciplinary board for failing to protect the interests of a third party in settlement funds. In 2000, respondent was admonished by the disciplinary board for engaging in conduct which constitutes a conflict of interest.

. Respondent testified that he was going through significant marital difficulties during the relevant time frame. His wife had a drinking problem, and as a result, he became the primary caretaker of their three children. The couple separated in October 2000 and divorced in August 2002, at which time respondent obtained full custody of the children.

. The board noted that respondent was ordered to deposit $5,000 into the registry of the court; however, his former firm, Milling Benson, paid this amount.